IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) MICHAEL DELANEY, | ) |
| Plaintiff, | ) |
| | ) Case No. 4:21-cv-00544-JFH-SH |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| (1) CITY OF TULSA, OKLAHOMA | ) |
| (2) AARON RUSSELL | ) ATTORNEY LIEN CLAIMED |
| | ) |
| Defendants. | ) |

**COMPLAINT**

**COMES NOW**, Plaintiff Michael Delaney ("Plaintiff" or "Mr. Delaney"), and for his causes of action against the above-named Defendants, alleges and states the following:

**PARTIES, JURISDICTION AND VENUE**

1. Michael Delaney is a citizen of the State of Oklahoma.

2. Defendant City of Tulsa, Oklahoma ("City" or "Defendant City of Tulsa") is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

3. Defendant Aaron Russell ("Russell") was, at all pertinent times, an officer in the Tulsa Police Department, employed by Defendant City of Tulsa. Officer Russell committed underlying violations of Mr. Delaney's constitutional rights, explained below in more detail.

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

5. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

- **Facts Specific to Michael Delaney**

8. Paragraphs 1-7 are incorporated herein by reference.

9. On or about March 21, 2020, Michael Delaney was sitting in his parked vehicle near 2800 S. Pittsburg Avenue in Tulsa, OK.

10. At all pertinent times, Mr. Delaney was parked on the side of the road, posing no threat to any persons or property.

11. At approximately 1:00 a.m. on March 21, 2020, Defendant Officer Russell was allegedly dispatched to Mr. Delaney's location on account of "a suspicious person in an SUV."

12. Once arriving at the scene of Mr. Delaney and his vehicle, TPD Officers, including Defendant Russell, approached Plaintiff while he was in his vehicle.

13. Officer Russell approached the driver's side door and shined his flashlight in Mr. Delaney's eyes and began questioning him.

14. Mr. Delaney, who had committed absolutely no crime and was in his own vehicle, rolled down his window to speak with Officer Russell while two other TPD Officers stood to the side of Mr. Delaney's SUV.

15. Mr. Delaney was being cooperative and answering Officer Russell's questions when, suddenly, Officer Russell pulled his gun out of his holster, pointed it at Mr. Delaney, and began shouting at him.

16. Officer Russell shouted several times in quick succession for Mr. Delaney to put his hands up and Mr. Delaney immediately complied with the order.

17. Officer Russell then opened Mr. Delaney's front driver's side door, took a couple of steps back, pointed his gun at Mr. Delaney, and told him to get out of the car.

18. Confused as to why Officer Russell suddenly began to shout and point his gun at him, and fearing that he was about to be shot and killed, Mr. Delaney began driving away.

19. At the time that Mr. Delaney began driving away, no TPD Officer, nor any bystanders or any other people, were in front of the vehicle or in any danger whatsoever.

20. In fact, the other TPD Officers were several feet to the side of the vehicle and parallel to the back end of the SUV.

21. Once Mr. Delaney began driving away, Officer Russell fired at least five (5) shots at Mr. Delaney, landing one bullet in Mr. Delaney's left shoulder.

22. At the time that Officer Russell fired his first shot, he was approximately 5-7 feet to the left of the SUV and 5-7 feet behind the SUV's back tires.

23. All of the bullets fired by Officer Russell entered the left and/or back portions of the SUV. The third, fourth, and fifth shots were fired when the SUV was several car lengths ahead of all of the Officers.

24. TPD Officers later arrested Mr. Delaney and charged him with possession of a firearm (after former conviction of a felony) and assault with a deadly weapon, despite the fact that there was absolutely no probable cause for either charge. Those charges were ultimately dismissed.

25. Mr. Delaney eventually pled guilty to a single count of Obstructing an Officer.

26. At all pertinent times, Mr. Delaney posed no threat to any officer or any other person.

27. Additionally, TPD released a statement in conjunction with the footage stating, "Review of the in-car video and body worn camera evidence ***did not support*** the initial belief that officers were assaulted with a vehicle…" (Emphasis added).

28. Indeed, Officer Russell was subsequently indicted by a grand jury with one count of Reckless Handling of a Firearm. On August 11, 2021, Officer Russell pled "no contest" to the charge and was given an eighteen (18) month deferred sentence. *See* CM-2020-3039; Tulsa County District Court.

- **Policies, Practices, and Customs of the Tulsa Police Department**

29. Paragraphs 1-28 are incorporated herein by reference.

30. TPD has a pattern of using unnecessary and excessive force on civilians, especially those who are not suspected of serious crimes.

31. For example, on February 5, 2017, TPD officers encountered Ira Lee Wilkins ("Mr. Wilkins") while he was sitting in his parked car at Jackie Cooper Imports of Tulsa, at 9393 South Memorial Drive in Tulsa, OK.

32. TPD Officer Will Mortenson ("Officer Mortenson") walked to Mr. Wilkins' car and yelled at him to turn off the radio.

33. Mr. Wilkins complied with this order and remained seated in his car.

34. Officer Mortenson then ordered Mr. Wilkins out of his vehicle and, again, Mr. Wilkins complied.

35. Officer Mortenson then turned Mr. Wilkins around so his back was facing the officer and pushed Mr. Wilkins against his vehicle.

36. Next, Officer Mortenson pulled Mr. Wilkins's hands behind his back, handcuffed him, and began frisking him. Another Officer, Angela Emberton ("Officer Emberton") stood just inches away from Mr. Wilkins.

37. As Officer Mortenson was searching Mr. Wilkins, he asked Mr. Wilkins to identify himself. Mr. Wilkins slightly hesitated and Mortenson yanked back on the handcuffs and then forcefully pushed Mr. Wilkins up against his car.

38. Mr. Wilkins then asked why the officer was using so much force on Mr. Wilkins's wrists. Mortenson responded by threatening Mr. Wilkins with additional harm while the other officers on the scene can be heard laughing in the background. Emberton can be seen grabbing Mr. Wilkins's right arm at this point.

39. Mr. Wilkins again asked why Mortenson was exerting so much pressure on Mr. Wilkins's wrists, to which Mortenson responded that he needed to get into Mr. Wilkins's back pocket.

40. The two officers then began to yank on Mr. Wilkins's arms and Mortenson yelled at Mr. Wilkins to "quit." Mr. Wilkins then asked what he was supposed to be "quitting."

41. Approximately five seconds later, Officers Mortenson, Emberton, and Rangel forcefully took Mr. Wilkins to the ground.

42. Mr. Wilkins began pleading with the officers to stop and that they were breaking his wrists. A voice from one of the officer's radios then asked if the officers had "spray," and when the officer responded in the affirmative, an order was given to "spray him," despite the fact that Mr. Wilkins was compliant, not resisting, in handcuffs and subdued with three officers on top of him.

43. Mr. Wilkins continued pleading with the officers, who told him to "stop it." A "spraying" sound is then heard as Mr. Wilkins was doused with pepper spray.

44. Mr. Wilkins then began wailing in obvious distress as a result of being sprayed with pepper spray.

45. Mr. Wilkins was ultimately charged with: 1. Assault & Battery upon a Police Officer; 2. Actual Physical Control of a Vehicle while Intoxicated; 3. Resisting an Officer; and 4. Public Intoxication.

46. All of these charges were later dismissed at the request of the State, as they were all completely unwarranted.

47. On or about October 16, 2018 at just before 6:00 a.m., TPD Officers encountered Earnest Joe Fields ("Mr. Fields") at a QuikTrip store located at 4545 N. Lewis Avenue, Tulsa, OK 74110.

48. Officers Temple and Jamgochian-Sallee were called to the QuikTrip on suspicion of a non-violent domestic dispute between Mr. Fields and his wife, who was in her car at a gas pump in the Quik Trip parking lot.

49. When the Temple and Jamgochian-Sallee arrived at the QuikTrip, Mr. Fields was in the store making a cup of coffee.

50. Temple and Jamgochian-Sallee made contact with Mr. Fields inside the store as he was preparing his coffee before he purchased it at the counter.

51. Officer Temple asked Mr. Fields to come outside and "tell his side of the incident."

52. Mr. Fields told him that he would comply with their orders and go outside, but he wanted to pay for his coffee first.

53. Officer Jamgochian-Sallee then exited the QuikTrip and went to speak with Mr. Fields' girlfriend, who was in a car in the QuikTrip parking lot.

54. Mr. Fields then walked to the counter and paid for his coffee. Mr. Fields also paid in cash for some gas that he intended to then go outside and pump.

55. Temple then exited the QuikTrip and stood right outside of the entrance/exit, holding the door open as Mr. Fields paid for his coffee.

56. Around this time, Officer Cherish Comfort arrived at the QuikTrip, exited his TPD vehicle, and walked to where Temple was standing.

57. Next, at the request of Officers Temple and Comfort, Mr. Fields slowly took off his jacket and placed his belongings on the counter of the QuikTrip.

58. Then, still following the Officers' commands, Mr. Fields stood just inside of the QuikTrip and spoke to Temple and Comfort.

59. Officer Comfort held open one of the doors of the QuikTrip and stood next to Mr. Fields while Officer Temple stood just outside of the QuikTrip, facing Mr. Fields.

60. Mr. Fields told the Temple and Comfort that he was going to go pump the gas that he'd just paid for and was happy to answer any questions they had.

61. As Mr. Fields calmly walked towards his car to pump his gas – and despite having followed all of Temple's and Comfort's commands and staying composed – Mr. Fields was then forcefully and unnecessarily tackled by Officer Comfort as he stepped outside of the QuikTrip.

62. Officer Comfort slammed Mr. Fields to the ground, injuring his back.

63. At the time of this forceful takedown, Mr. Fields was: (a) not suspected of committing any serious crime; (b) complying with the Officers' commands; (c) not posing any threat of physical harm to the Officers' (or anyone else); (d) not attempting to flee; and (e) not resisting arrest.

64. Temple and Comfort next placed Mr. Fields in handcuffs and put him in their patrol car.

65. As a direct result of Comfort's use of violent, objectively unreasonable and excessive force on Mr. Fields, Mr. Fields suffered serious bodily injury, as well as mental pain and anguish.

66. Mr. Fields, Mr. Wilkins, and Mr. Delaney are all Black men.

67. There is significant evidence that TPD has a practice and/or custom of "unnecessarily aggressive policing" against Black civilians.

68.    In June 2020, TPD Major Travis Yates publicly stated that Tulsa police were "shooting African-Americans about 24 percent less than we probably ought to be, based on the crimes being committed."

69.    Lt. Marcus Harper, President of the Black Officers Coalition, condemned Yates's comments and opined that there was a problem with TPD's "culture of policing…."

70.    Shortly thereafter, video surfaced of white Tulsa officers stopping and handcuffing two Black teenagers for jaywalking.

71.    In one video, an officer is seen forcing one of the boys to the ground and then pinning him down after he was handcuffed and subdued.

72.    As observed by Lt. Harper, this type of unnecessarily aggressive policing is "not happening in other parts of town."

73.    Lt. Harper's sentiments are supported by a 216-page report published on September 12, 2019 by John Raphling, senior US researcher at Human Rights Watch, entitled "'Get on the Ground!': Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma."

74.    Raphling's report "focuses on policing primarily as it impacts black communities in Tulsa, and especially poor black communities, that face policing in its most intensive forms."[1]

75.    Raphling found that "black people, even regardless of wealth or poverty, disproportionately receive aggressive treatment by police."[2]

---

[1] John Raphling, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, September 12, 2019, https://www.hrw.org/report/2019/09/12/get-ground-policing-poverty-and-racial-inequality-tulsa-oklahoma/case-study-us, last accessed on October 16, 2020.
[2] *Id.*

76. In analyzing data from 2012-2017 provided by TPD, Raphling found that "black people in Tulsa are 2.7 times more likely to be subjected to physical force by police officers than white people on a per capita basis."[3]

77. Raphling further found that although black people only comprise 17 percent of Tulsa's population, they receive 39 percent of police uses of force. In contrast, "white Tulsans were 65 percent of the population but subject to only 55 percent of force incidents."[4]

78. Raphling also found that "black arrestees were subject to force at nearly twice the rate of white arrestees when the violation that led to the force incident was a less serious 'public order' crime[5] or drug sale and at three times the rate for arrests on a warrant, a large portion of which were for missing court dates or payments on low-level violations."[6]

79. Concerningly, Raphling found that with extremely limited exception, use of force incidents committed by TPD Officers are determined to be compliant with TPD policy.

80. According to Raphling's analysis of the data provided by TPD, "of the 1700 incidents and 3364 distinct 'non-deadly' force actions reported by police from 2012 through 2017, the Tulsa Police Department found only two forceful acts that were not 'within policy.'" TPD imposed no discipline in those two cases. Further, Internal Affairs reports from 2012-2017 indicated that only five forceful acts were deemed to be noncompliant with TPD policy and only one of those resulted in discipline.[7]

---

[3] *Id.*
[4] *Id.*
[5] Such as the crimes of which Mr. Fields and Mr. Wilkins were accused.
[6] John Raphling, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, September 12, 2019, https://www.hrw.org/report/2019/09/12/get-ground-policing-poverty-and-racial-inequality-tulsa-oklahoma/case-study-us, last accessed on October 16, 2020.
[7] *Id.*

81. On December 18, 2019, TPD Officers shot and killed Tyler Hall ("Mr. Hall") at a QuikTrip located at 1202 W. 23rd Street in Tulsa, OK.

82. Mr. Hall was in the midst of a mental health episode and was holding a gun in his hand but holding it by his side and clearly pointed to the ground.

83. The TPD Officer who arrived to the scene first attempted to talk to Mr. Hall about the situation, which remained relatively calm for a short time.

84. However, the initial officer's supervisor quickly arrived at the scene and clearly had no intention of attempting to deescalate the situation.

85. The supervisor burst into the QuikTrip and almost instantly began firing at Mr. Hall, who never once moved the gun in his hand even an inch in the direction of anything other than the ground.

86. Mr. Hall was fatally wounded by the gunshots.

87. The supervisor's actions were consistent with TPD's history of using reckless force and failing to attempt to deescalate situations.

88. TPD Officers still repeatedly use excessive force on compliant, subdued, and/or non-resistant civilians even after the instances described, *supra*, which is evidence that their unconstitutional practices are allowed to continue unabated.

89. For example, on August 8, 2020 Jonathan Randell, a mentally disturbed man was shot and killed by TPD Officers. Randell was in the midst of a mental health break and was confronted by approximately eight (8) TPD Officers outside of a facility for abused women.

90. Upon information and belief, despite the fact that Mr. Randell was cornered against a fence by the officers, who were at a safe distance away from him, the officers unloaded at least 60 rounds, instantly killing Mr. Randell.

91. On November 5, 2020, Jacob Rucker was shot and killed by TPD Officers near the OYO Hotel, which is located in the 1000 block of North Garnett Road in Tulsa.

92. Four Officers opened fire on Rucker, instantly killing him.

93. The aforementioned incidents are consistent with longstanding TPD practices and/or customs. These practices/customs include an utter failure to train and supervise officers, a failure to discipline officers for excessive force, and maintaining a culture condoning the use of reckless force while ignoring de-escalation tactics.

## CAUSES OF ACTION

### I.

### VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

**A. Underlying Violation**

94. Paragraphs 1-93 are incorporated herein by reference.

95. At the time of the complained of events, Plaintiff, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable excessive force to injure him and his bodily integrity.

96. In the totality of the circumstances, Plaintiff was unarmed, cooperative, and in no way posing any immediate threat to the safety of TPD officers, himself or others. Plaintiff only attempted to flee once Officer Russell recklessly pointed his gun at Plaintiff for no reason, startling Plaintiff.

97. Plaintiff was not a threat to any officer, or to any other person at the time Officer Russell fired the five shots at him.

98. Any reasonable police officer would, or should, have known of these rights at the time of the complained of conduct as they were clearly established at that time.

99. Russell's actions of in shooting Plaintiff when he was unarmed and not a danger to anyone were objectively unreasonable and excessive uses of force under the circumstances, and thereby violated the Fourth Amendment rights of Plaintiff.

100. Russell's actions were reckless and deliberately indifferent to Plaintiff's federally protected rights.

101. Russell's use of objectively unreasonable, excessive force restrained Plaintiff of his freedom and caused him multiple serious bodily injuries, as well as mental pain and anguish, and the damages alleged herein.

102. As direct and proximate result of Defendant Russell's conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Plaintiff's rights secured by the U.S. Constitution, including punitive damages.

**B.     Municipal Liability (City of Tulsa)**

103. Paragraphs 1-102 are incorporated herein by reference.

104. There is an affirmative link between the deprivation of Plaintiff's constitutional rights and TPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

105. Prior to the excessive use of force on Plaintiff, there have been numerous other instances of constitutional deficiencies within the TPD that the City was aware of, but failed to alleviate, as discussed in ¶¶ 30-87, *supra.*

106. In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior constitutional violations conducted by its officers.

107. Thus, the City has created and tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to uses of force.

108. The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Plaintiff's civil rights and the resulting injuries alleged herein.

109. As a direct result of Defendants' unlawful conduct, Plaintiff has suffered serious actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

## II.

## NEGLIGENCE
### (Pursuant to the Oklahoma Governmental Tort Claims Act)

110. Paragraphs 1-109 are incorporated herein by reference.

111. Officer Russel owed Plaintiff a duty of reasonable care to assure that he would not use objectively unreasonable force on Plaintiff.

112. As alleged herein, Russell breached that duty of reasonable care.

113. As a direct and proximate result of Russell's negligent uses of force, Plaintiff suffered actual physical injuries and mental and physical pain and suffering, entitling Plaintiff to recover compensatory and special damages.

114. At all pertinent times, Russell was acting within the scope of his employment and, thus, TPD/the City of Tulsa is vicariously liable for his negligence.

115.   Plaintiff submitted a Tort Claim to the City of Tulsa putting them on notice of Plaintiff's claim.

**WHEREFORE**, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com

***Attorneys for Plaintiff***